We agree to approach because we are unsure as to procedures since there are two cases being heard. Do you all want us to do all of them at once? You know, that's a really good question. I actually think it would be a good idea to take up the Albergetti case first and then the Jones case. That would be fine, whatever the panel would like, Your Honors. We're also prepared to do the arguments together. You can do that since the issues, you can do all the issues even though there are some that are the same and some that are different. But Albergetti seems to present more unique, you know, addition issues such as cost certification and the statute of limitations. Okay, so if we could then judge, therefore, but as I understand it, I am the appellant in both cases. Right. And in that case, if we're going to, and there's a total of 35 minutes per side. Right. So then if I go first, I would then request to reserve 15 minutes for rebuttal. You also have your cross appeal. So does he get rebuttal for cross appeal? Yes. So you can go through each of the issues in Albergetti and Jones if he would like. Go ahead. And then you have 30 minutes, you'd want to reserve 15, no? I think so. 15, oh, you're right, 35, you're right. Okay, so then you can reserve your 15 for the cross appeal. To reply to the cross appeal. Right. Right, so, okay, that's what I'd like to do. And, Your Honor, we reserve five for reply on the cross appeal. Okay. So then you have 30 at the top and five at the bottom. You want five. Okay, that's fine. All right, so. Thank you for indulging us. Watch the clock, 20 minutes for starters, right? Say again, I'm sorry? It's going to be 20 minutes right now. Right. Yes. Okay. And you want us to address the issues in Albergetti first. Right, I think there are more of them. If it pleases the court, what I would like to do then, yes, there are more issues in Albergetti. And if it pleases the court, what I'd like to do is reserve, not address the preemption issue and save that for my rebuttal. Because it's on the cross appeal that the preemption issue was raised by Corvus Corporation. If that is acceptable to the court order. So then I would like to address the merits of the various issues relative to leading to the motions for summary judgment on both Shirley Jones and Anna Marie Albergetti. And then after my opponent speaks to whatever issues he wishes to speak, I would reserve that 15 minutes to address the preemption issue and any other comments I might have on what he has to say. That would be the way I would proceed. That's fine. And I will address all of the Albergetti issues and the Jones issues initially. And then we'll see how that goes. Of course, if the court has questions, I'd be happy to answer them. Ma'am, did you, is there, I guess this is a question for Corvus, but is there a First Amendment issue in the Albergetti appeal? To my knowledge, there is not, Judge, because it's my understanding of the way the district court ruled that he suggested, although it was in dicta of his opinion, that Corvus cannot take the benefit of the First Amendment. But I would be happy to address that when and if my opponent addresses it in his remarks. So, having said that, since I prepared this argument to have Shirley Jones go first and since we're going to consolidate the hearings on this stuff, I say to the court this. The district court ruled as to Shirley Jones when it granted Corvus summary judgment that the mere fact that Shirley Jones walked down a red carpet event where she knew pictures were being taken of her, that that permitted Corvus to purchase those pictures, put it on its websites, and sell those pictures to anyone around the world for any purpose. Because the district court ruled that by her walking down the red carpet, that constituted her consent as a matter of law to having Corvus post that picture or those pictures up on its websites. Counsel, often in these cases, there will be a sign posted before they enter the red carpet. Was there no such sign in this case, or was there? I believe there is a sign, but that sign, and it's in the record, that sign says that when you enter here, enter into the red carpet event, and it's sponsored. Incidentally, one of the red carpet events that she appeared at was sponsored by the Screen Actors Guild, which, as you know, has filed an amnesty brief in this case. And they permit photographers to go into these red carpet events, shoot the pictures, and warn the photographers in the papers that have been filed with the court, and to the attendants, that your pictures will be taken and distributed to promote the event, the red carpet event. And that's clear. Now, the district court ruled that by virtue of the fact whether she saw the picture, I'm sorry, saw the warning sign or not, that constituted consent as a matter of the custom of the industry. Well, I suggest, Judge, that in the record, in her deposition, and in her affidavit, she denied that she ever consented. She never knew about Corvus when she walked into the red carpet event. Counsel, she did also testify that she posed for photographers like Trapper willingly, and that she knew he would distribute her photographs. And so why would we draw a line, if he was going to distribute her photographs, why would we draw a line between allowing him to distribute them or allowing Corvus to distribute them pursuant to a license by Trapper? Now, Trapper, if you take a look at his declaration, he doesn't say that he would distribute the pictures to anybody else but other than to promote the event. If you take a close look at the declaration of Mr. Trapper, and how it's quoted in the record, and let me see if I can give you the ER site on this. If you take a look at ER 63-64, and he says, for the benefit of the events, and that was a Screen Actors Guild event. So, yes, she'll testify that, yes, I knew that these photographs would be distributed for the benefit and publicity of the event. Well, he also said that the red carpet was set up explicitly to get publicity for the celebrities who walked the walk. Right, that is true. And the custom and industry is that that is the purpose for the event and publicity at that event. Where do you get the words for the event? What he said was for publicity for the celebrities. Right, at the event, right. But to distribute it to a third party who sells it worldwide to sell it worldwide for use in commercial, any commercial purpose whatsoever. Corbis' contracts limit what use its end users can put these pictures to. This is true. You mean when somebody purchases a picture on the website, and if they're going to use it for what's considered a media-type purpose, which is exempt under California statute anyway, they still will be charged for that use. But as I read it, they were saying you couldn't use it, for example, to sell her picture to Coca-Cola to put on the Coca-Cola bottle and imply that she was endorsing Coca-Cola. Well, that's not exactly correct, Your Honor, because what happens then is if Coca-Cola was buying Shirley Jones' picture from Corbis on its website, it would have to check a particular box to indicate that it's using it to endorse a product. And if so, and you'll see it's in the record, their own declarants say it, they would then calculate the amount of money that would be charged to Coca-Cola for the purchase of that picture. And if you'll note from the record and from the Corbis website, if the purchaser decides that that purchaser wants to use it on a Coca-Cola bottle, it will be charged more. Of course, none of that money goes to Shirley Jones. And it also, their warnings on the website say, on Mr. Coca-Cola, if you're going to use this, if you're going to use this on a Coca-Cola bottle, what you've got to do is you've got to go to Shirley Jones and get a release for her rights of publicity. Because we're not selling you her rights of publicity, which goes to other issues in the case in which Corbis recognizes the difference between a copyright and a right of publicity. Well, then Coca-Cola, I assume, would have to pay Shirley Jones. Well, I would assume so too, but you know what? They don't because Shirley Jones doesn't even know it's going to be placed on a Coca-Cola bottle. Because she's never informed by anybody, by either Coca-Cola... Why isn't that an issue that she has with Coke and not with Corbis? Well, because first of all, she, you know... Why is Corbis responsible for regulating Coke's use of the picture in that way? Because they give a warning, I take it, Your Honor. They give the warning on their website that says, Mr. Coca-Cola, I want you to know all you're buying is the copyright to this picture. If you want to use it for any other purpose, and if you want to use it on your bottles, then you've got to cut a deal with Shirley Jones. That sounds like a really salutary warning. It sounds like it's protecting both Corbis and Jones. Well, but then you place the burden on Shirley Jones. But you place the burden on Coke. Coke violates it, and Shirley Jones has an action against Coke. I will doubt that in a second, Judge. She certainly does, okay? But what you do is, since these celebrities have no knowledge that this is being done, okay, and since Corbis is the one who is presenting that situation, it's similar to the Napster and Grobster cases, which is cited in all the papers, in which they're the ones, Corbis is the ones, that starts the ball rolling. Now, if none of you see... Isn't this just what has always occurred, that the photographers, and it's just occurring in a new medium, that the photographers at these events take these photos, and they're the copyright owners and authors of the work, in the photo, and then they're distributed widely to news outlets, who knows to whom, and kept in archives. And this is just distributing it through a website, as opposed to distribution in the manner in which it has been done before, the Internet. Well, the distribution by... Again, Judge, both under California law and all the law that I'm aware of in this area, any sale or distribution to a media outlet, such as a newspaper, etc., is exempt. And we are not suing the photographers. And the fact that Corbis says that it is... What is Corbis doing that's wrong? I mean, if the photographs are to be distributed, who's going to buy them without seeing them? Right. Perhaps nobody. But isn't it part of what is in the celebrity's interest to get publicity from having attended these events, from having been photographed on the red carpet at these events? Well, that's for the event, Judge, but to... Not just for the event. It's for the benefit of the celebrity. I mean, doesn't additional publicity benefit the celebrity? I don't think a celebrity would deny the fact that they wish publicity. They just wouldn't deny that. It would be unrealistic for a celebrity to do that. They wouldn't walk the red carpet. Okay. I understand that. And that's for that event and for the newspapers. But what happens is, and you can even go to the Corbis websites, and this is at the ER-603, and at that website that's cited in the record, ER-603, Corbis says it's customers. Who are its customers? Corbis brands serve hundreds of thousands of clients in leading advertising agencies, direct marketing, and graphic design agencies. And so what it does is it provides these pictures to those folks for a price, and it even has its own rights-managed section. Counsel, if Trapper, the photographer, who's entitled to copyright his works, had his own website, so it was direct dealing, and Trapper said, here's the photos I've taken of lots of people, including Shirley Jones. If you want some of these photos, contact me. Here's my price range. And, you know, if you're a newspaper, I'm a little cheaper than if you're intended for commercial use, but I want to warn you, you know, I can't sell you the rights to Shirley Jones for commercial use. If you want to do that, please contact Ms. Jones or other people I've photographed. Is there a problem there? Yes, there is, Judge, because, again, you're placing the burden on- But these are his copyrighted works. He cannot sell those copyrighted works to somebody else. Plus, he's not even having the copyright. Well, what he's selling is the persona of people like Shirley Jones and all the other celebrities who make money off of their own photos. Shirley Jones, for example, Your Honor, has her own website. She sells her own pictures. Well, what can he do with the copyrighted photos he's just taken? He can sell it to whomever he wishes with the consent of Shirley Jones. All he has to do is get the consent of- So he can take the picture and copyright it, but unless Shirley Jones says, you may release the photo, he can't do anything with the photo. He can't sell the photo because in so selling- Of course, we're not going after the copyright, but it doesn't matter for this discussion. He can't sell that photo unless he gets- Because what he's selling is not his copyright.  It's Shirley Jones' persona. You know, this is- When we start talking about what goes into making a great photo, and you think about iconic photos such as Im Jima or the soldier kissing the nurse after World War II or the little girl whose clothes have been blown off by the napalm in Vietnam, and do we have to go back to the little girl who is now a woman working at the UN and get her permission before Time Magazine can use this iconic photo from the Vietnam War? I think the deaf judge is a media use. And the photographer, although the law, so far as I understand it, doesn't impact the kind of companies like Corvus or a photographer. If it's a newsworthy event, it's exempt under the terms of all the rights of publicity laws that I am aware of. What I'm talking about, Judge, is on their website, that's one type of a use. But on the website, they advertise and they permit a commercial use for commercial products. The very same thing that a celebrity- But if Shirley Jones, for example, if Coke were to contact Shirley Jones and say, Shirley would like to use your picture on her bottle. And she said, great. And said, well, we'd like to use the one that was taken on the red carpet by Trapper. Now, if Coke can't get the permission from Trapper, then there's nothing they can do with this, can there? Yes, what they can do is ask Shirley Jones. We'd like to use that picture. But they can't use Trapper's photo of Shirley Jones, because that's the one that Trapper will be covering. Then they would make a deal both with Trapper and Coke. But if Trapper doesn't consent- You see, Trapper has his own rights here in this photo. It's copyright. There's value added by having somebody like Trapper, as opposed to having somebody like me go and take a picture of Shirley Jones. There's a difference between me taking something with my Blackberry and Trapper going and taking some iconic picture of- You, Your Honor, would have the copyright in the picture that you took. Yeah, but nobody's going to be foolish enough to buy it. Well, you never know. But you still would have that copyright. But you would have no rights to the rights of publicity of the persona of Shirley Jones. Because only she has that right. She has spent her lifetime developing that right. So she can use it. So she can sell her picture, because people want to buy the picture of Shirley Jones, because of who Shirley Jones is. Coca-Cola wants to buy the picture from Trapper, from Judge Bybee, or from anybody else, because it's Shirley Jones. She spends 57 years of her life developing her persona, so she can go out and endorse products herself. I heard you describe a statutory exemption for media. That's correct. That applies to National Enquirer? Well, there's some good cases on that, Judge. She would not agree to National Enquirer, because they defamed her at one time, maybe 20 or 30 years ago, if I've read the case. But they are a media, like there's the Hustler case out of Chicago, where even under certain circumstances, the media cannot take advantage of the exemption. There are rare cases in which the use was made. But I can't speak to whether or not that issue is we're not here to discuss whether or not Hustler magazine. It's pretty clear that there are magazines on that sort of fringe of the media, like National Enquirer, that are really looking to sell magazines because of whose picture they've got on the front cover. They're still recognized that they still would have First Amendment rights, in my view at least, because they are the media, and we want to protect the rights of the media, just like the New York Times, they have their own database, and the Glossary, they all have their own databases of famous celebrities. And when they don't, then they go to a place like Corbis, and they will get a picture, and when they get that picture, they are exempt. There's only one state that I'm aware of, Your Honor, in which a company like Corbis has an exemption when they sell to the media, and that would be the state of New York. So in the state of New York, the Corbis, when it sells to the New York Times one of its pictures, and if, for example, it was a picture of Shirley Jones, Shirley Jones would have no cause of action against Corbis in the state of New York for selling her picture to the New York Times. There is no such statute in the state of California, and nor any other state as far as I know. So, but, you know, we're talking now basically about the end use being one for First Amendment or media rights, which we are not attacking here. And indeed, the law is unclear as to whether or not Corbis could be sued for any distribution it made, or a photographer it made to a media. The fact is that Judge Goldberg in the Circuit Court of Cook County has already ruled in the James Brown case there that he has certified a class, which is up for reconsideration now, but he has limited the class such that if Corbis were to have sold to somebody who is a media user or a newspaper user of one of its pictures, Corbis is exempt under the Illinois Rights Publicity Statute from that use. So we're talking now, however, about the rights of Shirley Jones when she is commercially exploited and under the California statute, she doesn't even have to have her picture sold. It's offered for sale. If you look at the statute, it's offered for purchase to anybody who wants to buy it for any purpose whatsoever. Counsel, you're over the 20 minutes, and you're including into your 15-minute rebuttal. Okay, then I'll be back to see you. All right. Thank you. Yes, 30 minutes. May it please the Court, I'd like to start with the preemption issue because I think before we get to the issues like consent, which Corbis doesn't believe is necessary, but which was nonetheless implied, we need to determine whether or not there's cause of action, and I'd like to start with what it is that Corbis does. Corbis licenses images through a comprehensive database. In many cases, it acts at its own principle as the owner of photographs, but in the case of Mr. Trapper, in thousands and thousands of uploads by photographers every day, and the wire services, the copyrights are retained by the photographer or by the wire service. Corbis is merely serving as a distribution agency. It distributes all kinds of photos, not just celebrity. It distributes them to all kinds of users, including media, publishers, and commercial uses when requested. Has the whole landscape changed now that we have the Internet and that they can upload thousands of pictures? Does this really change the whole landscape? This is the modern way of doing what was previously done in print catalogs. It also allows for much higher profitability, I would think. It allows for a greater variety. It allows for faster uploads and quicker selection by the end users. Profitability is something Corbis would like to get to, but right now what it's trying to do is to build a database that is useful to people who need images to tell stories, and that includes the press and also includes commercial users who, in those situations where they make a commercial use, are obligated by Corbis's license agreement to buy those rights, those separate rights of publicity, from a person who might be depicted. The situation as we see it is a very dangerous one if it were to become the case that photographers could not display images without that display becoming a violation of the right of publicity. This would give each person depicted in any image a veto over whether or not the public would ever get access to that image, either as a media user or, in the case of commercial users, whether or not the commercial users might be able to find the image that they would then have to pay the subject for. So it's detrimental ultimately to the subject, as your Honor pointed out, to have it impossible for people to even see what they might contract with the subject to license a right of publicity. And the result of this would be an impact not just on Corbis, but this entire industry, because Getty licenses this way and because all the other archives, including the New York Times, for example, Ms. McNally, the photo editor of the New York Times, testified that the way we license our archives is we require anyone who needs to buy the right of publicity rights from a subject to go to that subject. To your Honor's point, it is easier, absolutely easier for people to find what they need, but this merely continues exactly the process that has existed for decades that's followed by everyone in the industry, including the New York Times. And so what we think is happening here is we have a proposed solution, which is get permission from anyone who's depicted in search of a problem. We don't think that there actually could be a lot of genuine dispute. The display of images for potential use by the media is a good thing and that it's required by the Copyright Act. And this is the right, this is the emolument of the person who creates the copyright, even if it's only from a blackberry. Under your theory here, if Trapper had taken a really great picture of Shirley Jones, and aside from, let's say the media picking it up and said, whoa, look at this picture, this is really a cool picture of somebody who's had an important part in American TV and movies, can he license it, for example, on posters? That's an open question we don't need to deal with here. And I think there's an argument that he can license it on posters because that's what happened in the Joe Montana case. And the Joe Montana case sided to three other cases around the country where other individuals, Jesse Jackson videotaped sale, Pat Paulson posters, were held to be protected by the First Amendment. But here we don't have... Even though they were being held out for commercial use. Exactly right. For sale. Exactly right. And that's under the First Amendment. But in that scenario, you're just selling a reproduction of the work of art. You're not using it to sell something else. Exactly right, Your Honor. That is right. That is why in those cases, the courts have said, you're just selling a poster of the image. You're not using it to promote Coca-Cola. But let me back up one step. Because Corbis doesn't sell those posters. It licenses copyrights. And if the photographer might be able to sell that poster under the First Amendment, that's not what's happening here. Corbis does not sell posters. Well, I think the photographer... Forget Corbis. The photographer takes a picture. It's a work of art. It's a proper subject of copyright. He owns it. He's the author and the owner unless he sells it to somebody else. He has the right to distribute it. And he gets the right to distribute it in any way he wants to. That's what copyright is all about. It gives him five rights. Exactly. And that includes the right to license commercially. The copyright law does not say you can only license to non-commercial uses or we would not have a lot of copyrights being licensed. One of the emoluments of copyright is the right to license to commercial users. And the reason that this is a problem in search of a solution is the end complaint that we could all agree would be valid would be if Coca-Cola had made use of Ms. Jones or Ms. Alberghetti's picture and not paid her. If the end user hadn't paid, that would be wrong. But that is not a responsibility of Corbis and it's also not something that on this record is a serious and pervasive problem. This is not a situation where we are finding some developed record showing lots and lots of uses that people aren't being paid for. Why does Corbis charge more money to Coca-Cola that intends to use Shirley Jones' picture on a bottle than it does to the New York Times if they intend to use the picture in the magazine? Whether you are a golfer or a gopher, the price for a commercial use is going to be based on the market for commercial uses and the price for non-commercial uses, media uses, is going to be the price for media uses. The market for commercial uses is a higher price. That's all. That's what markets bear. The fact that it's Ms. Jones who is depicted does not in any way increase that price. And in fact, the declaration of Mr. McClain specifically states and this is uncontroverted, that the actual existence of an individual celebrity or non-celebrity on a photo is not what determines the price. What determines the price is the value of the copyrighted work. And as your Honor pointed out... If Coca-Cola were trying to buy two pictures, one of Brad Pitt and one of Shirley Jones, would they have to pay more for the Brad Pitt because he's a little more current? No. The fact that it's commercial use is the sole determining factor. The price would be the same and it does not depend on the identity in the picture. It in no way depends on the identity in the picture. And that's uncontroverted in the record. It may depend on the geographic use or the prominence on the website or other factors about the use might matter. But the identity of the individual is not a determinant in the price. So just to explain to you how this works. So the photographer takes his photo and he wants to sell to the general public, to the media, to whoever. He wants to profit off of his work. So what Corbis does is provide some distribution means, in Trapper's case, to profit off his work. Now, does he pay you? It's a revenue share, Your Honor. Okay. So meaning what? Meaning that we take some of the money and he takes some of the money. Okay. So he owns the copyright. We distribute his agent and we split the money. Okay. And the money is the money that you get from someone who's seen the photograph and decided they want to buy it from you for whatever reason. Exactly. Okay. And if Coke did use that picture to sell Coke, then Shirley Jones would have a cause of action against Coke. Exactly. For misappropriation or publicity or likeness, using her name and likeness to sell their product. That's exactly correct, Your Honor. And that's a Downing case. That's Downing. That's Downing. And Downing shows, in fact, that there is an ability to pursue the proper end user when they make a commercial use. And that's why Downing actually reinforces our preemption argument here. The preemption argument comes out of Section 301 of the Copyright Act. It requires the two elements for preemption. The first element is that the use, the first prong is that there are rights equivalent to the exclusive rights in copyright, quote, in works of authorship that are fixed in a tangible medium of expression and that come within the subject matter of copyright as specified by Section 102 and 103. This is what we call the subject matter of copyright prong. And the important point about the subject matter of copyright prong is that's a term of art under the Copyright Act. Section 102 of the Act describes what the subject matter of copyright is. And subject matter of copyright is works. It is a photograph. This is an original creation fixed in a tangible medium. This is a subject matter of copyright. This is a photograph fixed in a tangible medium. And therefore, the first element is satisfied. In fact, we're not talking about one photograph here, one fixed. We're talking about millions of them, not just at Corbis, but at every other photographer and distributor of photographs around. So, we think the first element of the test of copyright is the subject, is there a right in works that are fixed in a tangible medium and come into the subject matter of copyright, is satisfied when you have a claim that is focused on a subject matter of copyright, where the work is within the subject matter of copyright. When we talk about persona being the basis for the claim, as Mr. Gold discussed here, persona is a type of a claim. It does not describe whether or not a work is within the subject matter of copyright, which is what Section 102 describes. So, when we're focusing on the first prong here, we're talking about whether an image is fixed. I understand. You want to argue that the name and likeness contained in a copyright work is preempted by federal copyright law, right? We do argue that, Your Honor. Right. But yet, you agree with Downing that the claims in Downing were not preempted by copyright. That's exactly right. Because in Downing, there was more than just the use of the copyrighted rights. In Downing, there was also a promotional use, an advertising use, an added element. If in Downing, the T-shirts had not had the names of the surfers on it, have you changed it? It would still be not preempted because it was a promotional use of the copyrighted image. So, to deal with it in the framework of the statute, first element, is it a subject matter of copyright? The answer, yes. It's a photograph. There's no question that photographs are a subject matter of copyright. Exactly. The question then becomes, the second prong is, are the rights being claimed the equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106? It's not enough that you're in a photograph to be preempted. The claims must also be the equivalent of an exclusive right under Section 106. In Downing, when you don't just display or reproduce, but you use to advertise, that use is not something that the copyright enforces. Even though all you've got is the photo without any identification of who's in the photo. Correct. Because what has happened there is not merely a display or a license of the copyright, but a use of the image. So, if there is a use beyond what the copyright statute guarantees you, then you are not preempted. And that's why in law... The surfers were probably not terribly well known outside of the surfing community. What if this had been a photo of, you know, some random people that somebody was putting on a T-shirt without any other identifying information? Those folks can come forward and sue Abercrombie and Fitch for using their picture on a T-shirt? Potentially, they could, Your Honor, given how broad the California statute is, because this is not just a statute that governs celebrities, it governs others. If there's an implied endorsement... That would be preempted by copyright laws, even though the photographer, again, had added value by taking a really interesting picture of some random folks he saw in a park. Well, I'm not saying that that would necessarily be preempted, just the opposite. If a promotional use is made, you're doing something that the copyright rights, the Section 106 rights, don't necessarily provide you. But I guess the way I see it is that a name and a likeness, without being fixed in a tangible medium, is not the proper subject of copyright and, therefore, would not be preempted. Don't disagree until it becomes fixed, and once that persona is fixed for the moment, here's a picture of Ms. Jones kissing her husband and holding a sign taken by Mr. Trapper. That particular instantaneous fixation moves from unprotected into the realm of copyright. I don't think Judge Wilson got it wrong to say that the right that she was claiming was infringed, which was her right to publicity, common law, and statutory in California, that right is not preempted by copyright. The time that persona transforms into being bounded by copyright is at that time of fixation. Right, so I think the argument has to be limited to the facts that are at issue here when you're licensing photographs. I believe that that's a very fair read, Your Honor, that once we have a fixation into a photograph of a particular part of that persona, we've now bounded copyright. Understand, we're not claiming that the right of publicity is always preempted. It's fixed into the law's case. It is. Where already the way it was was a video production that was copyrighted, and that's why it was preempted. In the law's case, it was a recording, and the court said, the federal copyright law preempts a claim alleging misappropriation of one's voice when the entirety of the alleged misappropriated vocal performance is contained within a copyrighted work. The equivalent here is that the law preempts a claim alleging misappropriation of a likeness when the entirety of the alleged misappropriated instance is contained within a copyrighted work. That's why I think you lose on the preemption issue, because I don't think that the name and the likeness is preempted. I do tend to agree with you that the work of art is within the subject matter of copyright, and that's sort of fundamental to copyright. I think that where your Honor goes with that is looking and trying to determine whether the claim is within the subject matter when the statute actually speaks to the work being in the subject matter. That's what the statute reads, is the right in works of authorship that are fixed in a tangible medium. Well, they're right. And I'm not talking about a claim. I'm talking about the right to publicity, the right to your own name and likeness, versus the copyright interest in a work that's the proper subject of copyright. And I think our point here is not that the entire persona in any way is preempted. We do not claim that. We claim that it becomes bounded and preempted in that instance in which all you're asserting is a right in a fixed work that is the same as a right guaranteed by copyright. We are not suggesting that all pictures are necessarily preempted. Your Honor, I think another reason why copyright does not preempt the rights of publicity in this case is because Jones couldn't copyright that photograph. Very true. But the fact is that the photograph includes a fixation that has her in it. And again... I just think you can prevail without prevailing on preemption. I don't disagree that we can, Your Honor, but this is critically important, because if these claims are not preempted, then displays are not going to be, in this industry, something that owners of copyrights are guaranteed that they can do. And that's why this is a very dangerous... Oh, the owner of the copyright in that work may display it, because that's one of the rights enumerated in the Copyright Act. Correct. And may display it without being subject to claims asserting rights of publicity and rights to aliveness. Correct. And that's all that Corbis does here. The second prong are these rights equivalent to a Section 106 right in copyright. What Corbis does is display a right expressly granted by the statute. What Corbis does is license, it authorizes others, a right expressly granted by the statute. It does not use for promotional purposes. It does not put on Coke bottles. All it does is what the copyright statute lets the owner do. If Corbis did something else, there would be no preemption. But as long as all it does is the rights that the copyright statute guarantees, a state can't take it away. Example, can a state pass a law? I don't think the state has done that here. Well, the state has a law on which a cause of action has been brought. I know that's true, but that doesn't necessarily mean that the cause of action is right or can prevail. And I'd move for one second to conflict preemption here. And the reason is that if your honor finds, if the court finds, that this is not a claim that is within the express preemption of Section 301, every court of appeal that has considered the issue has found that conflict preemption exists under the Copyright Act. But hasn't there only been one case that found that? Excuse me? Hasn't there only been one circuit that found that? There's been one circuit that applied and found actual conflict preemption, but all go through the analysis, is there conflict preemption? No court has ever said there is no conflict preemption available on copyright because there's an express preemption clause. And so if your honors concluded that the exact wording of 301 wasn't met, we need to determine whether or not making photographers unable to display and license their works that have people in them is a conflict with the purposes of the copyright clause. And we should pay attention to what Nimmer says now on this subject, because Nimmer now says that conflict preemption is the way that we should bound rights in copyright, bound rights in the right of publicity, so that only those that are promotional or advertising or used in trade are the rights that can be claimed, because anything else is going to interfere with the copyright scheme. Specifically, it's Nimmer's section, and this is a long cite, 101B3B, little Roman four, big Roman one, 101B3B41. And what he says is first construe the statute narrowly if you can, which your honors could do to construe it to the limit required by copyrights. Then, if you can, preemption draws the line, and the line should be where a use is in trade as opposed to a use under section 106. I'll stop on preemption unless you would like to keep on that track any longer, because I've used those. I think you can stop on preemption. Are there particular subjects you'd like me to address? I would move next briefly to the First Amendment, which we do think is another. You didn't argue it in Alberghetti, but you argued it in Jones. And the reason is the procedural one, it wasn't briefed in the Alberghetti case below, and so we didn't raise it here not having briefed it below. The reason it wasn't briefed below is because Judge Wilson reached out and decided it before we briefed it, based on a pleading allegation only rather than on actual facts. So it just never came up in the trial court. So the First Amendment requires a balancing test. Between the nature of the information conveyed and potential damage to the plaintiff's economic interests. This is the Guglielmi test. This applies not only to non-commercial users, but also to commercial users, as the Gianfrido case makes clear. And as the cartoons case, which was one in which images of people were reproduced in little memorabilia, and the court said that commercial use is not inconsistent with the First Amendment. So it applies in commercial cases as well. And so the question here is whether or not making available to the public an opportunity to view and potentially license these works. Very important communicative activity. And one that involves here matters of clear public interest. I don't think anybody disputes that when celebrities are on the red carpet, as the Supreme Court of California said, we're talking about the familiar idiom in which we conduct a fair portion of our cultural, business, and everyday conversation. The images and activities of celebrities. This is an important public event. This is what people care about and are entitled to see. Balance that interest against whatever interest there may be to Ms. Jones, economic detriment to her of having her images displayed. Public expression, injury to Ms. Jones. There is no injury to Ms. Jones from having an image displayed that can be licensed. There's no economic detriment. In fact, if anything, probably an economic enhancement because she might get a license out of it from a commercial user. The First Amendment here, therefore, would and does protect Corbett's display of these images. And there is, therefore, no necessity to have consent from Ms. Jones above that. Now, Judge Wilson decided the case on the narrowest ground, the implied consent ground. And I'd like to clarify a couple of things that Mr. Gold has argued about. First of all, this is not a situation where Corbett has taken a license from Mr. Trapper and then resold it. This is a representation in which Corbett does nothing other than act as the agent for the photographer. And Ms. Jones acknowledged that she wanted the publicity. She knew that the images had to be displayed in order to be licensed. And Ms. Jones did not consent to Corbett doing this. She wanted-in 40 years she had never put any limits on the photographers. And her only argument is, when I consented to Corbett, I did not consent to-I'm sorry. When I consented to the photographer doing this, I didn't consent to Corbett doing it as its agent. There is no dispute in the evidence that she understood that Mr. Trapper could work with others. And she didn't say that he shouldn't. And there's no dispute in the evidence about the custom and practice in the industry of photographers all the time using distribution sources, whether it's a wire service, whether it's Getty, whether it's the New York Times archive. And so when you allow and seek out affirmative publicity from photographers, you cannot come back later and put in a declaration of your subjective intent, I didn't really want Corbett to do this, and somehow obviate the objective manifestations of that time. That raises no factual issue, and that's what this court decided in the Newton case. Newton put in a declaration and said, I didn't want my name used with this show. And the Ninth Circuit said, you can't say after the fact that what you indicated by your conduct before is retracted. The implied consent here is clear on the record. There's been no identification of any fact that could raise an issue about it. And remember this, too, that Mr. Trapper, when he uploaded photos, did it in real time the same day as the event. So why don't we go into statute of limitations, grant summary judgment. The statute of limitations issue involves a single publication rule, and it applies in this case, because as the plaintiff put it in its complaint, it was complaining about the postings for the purposes of distribution of an image. These files were posted on the website, available for download automatically, at any time, by someone who chose to download that precise file. There was only one, in each photographic instance, work that was ever made available to the public. It was posted publicly on a website available for automatic download. It's no different than publishing an e-book, which is now available for automatic download. Or publishing a book on Amazon, which is available for automatic download. In a catalog. If you publish a catalog, it's not republished, it's because there's... Just because someone... Someone can look at it more than one time. Exactly right, Your Honor. And the OSHA case has already held that a publication on the Internet is subject to the single publication rule. Once you post something on the Internet, that's the publication. Here, the publication happened, and the downloads of that precise image could then continue to go forward. Counsel, you're asserting that a two-year statute applies? That's correct, Your Honor. And here, this happened more than two years ago? The first publication in every case was more than two years before the lawsuit was filed. And it's... The plaintiff's claim on this so far has been, yes, but the statute restarts when COAP buys a license. But that might restart the statute as to COAP. Actually, what they claim is, once COAP makes a use, that restarts the statute of limitations. Exactly correct. And she voluntarily dismissed. And that's why we could not bring a statute of limitations at the outset and obviate the need to get into the preemption and other kinds of issues. Counsel, you contend that you should have been awarded attorney's fees for the copyright infringement. That's exactly right, Your Honor. It's important to note here that the plaintiff states that they've never argued that each of the defendant's photo licenses is a distinct product. They don't argue that each new contract was a new publication. They recognize that once a work is offered on the site, and then each subsequent download occurred, that's all part of the single publication. So, are there other questions Your Honors have about the statute? They're intuiting into your five minutes. Thank you, Your Honor. I didn't realize it started counting up. Briefly on the statute of limitations issue, Your Honors, it's clear in all the briefs that have been filed that only Corvus knows when they first post the picture. That information, there's no way either any one of these three women could have known that their picture was within or without a statute of limitations by looking at the Corvus websites. I will address Shirley Jones' issue in a moment. Can I ask you a question? Sure. So, the testimony is that it's posted sort of immediately around the event. So, the events that issued took place. Right, right. Now, Shirley Jones, there is no statute of limitations issue in that case. Right. All right. I want to go back to Albregetti, though, for a second.  Because there is where he granted summary judgment on the statute of limitations. And what I wanted to say is that neither Anna Marie Albregetti or Bonnie Pointer had any way to know when their picture was posted on the Corvus website. It's not indicated on – there's no way to know it. Only Corvus knows that. Well, aside from the impracticality of them checking every day, the whole idea – They didn't even know the Corvus website existed. The whole idea of the statute of repose is that they've got two years to figure it out. Yeah, but they don't know that Corvus exists, and then they find out that their pictures are being used in whatever different way. But in any event, and there was this Kristof case, as you know, in the papers, in which when we filed the Albregetti case, there was a discovery period in which it would have been a jury question as to whether or not a reasonable person in Albregetti or Pointer's situation would have known that Corvus existed, would have been on the website, and would have known about the statute of limitations. It's a discovery rule. That's not the single publication rule. That's correct. There's two different rules. Right, but here the single publication rule applies. Well, wait. I'm just saying, when we filed it, we were within the statute of limitations in the district court. Then what happened was the Supreme Court of California did away with the discovery rule, and therefore, we lost on that. Can I ask you something? In these types of cases, couldn't you do discovery and figure out exactly when it was posted? Well, not before the case started. No, but I mean, you file the case, and then you find out. Well, we found out because they came in with the motion for summary, and Albregetti and Pointer. But what happened is, in terms of republications, to preempt my argument, because I think what happens is you take a look at the end user, and they republish it, or somebody else will republish it in a different fashion. But in the Albregetti case, so we lost on the motion for summary on statute of limitations. But we had a second count in the case based upon quantum merit, which has a three-year statute of limitations. And Judge Wilson said, well, we're within the three-year statute of limitations on count two. But he said that the gravamen of the claim was a rights of publicity statutory claim, and that, therefore, you lose on your quantum merit, too. So I'm granting summary judgment on that as well. Now, the statute 3344, if you take a look at 3344G, the statute specifically states, the remedies provided for in this section are cumulative and shall be in addition to any others provided for by law. So what he did was he... You're saying that even if he should have or could have dismissed 3344, common law, rights of publicity... Right, but we had quantum merit. You had another claim, quantum merit, that should remain in the case. Sure, absolutely. And what is that claim? It's about quantum merit or... I didn't articulate what the claim was. Well, that they sold these pictures within the statute of limitations, the three-year statute of limitations, and my clients got no money. And it's unjust enrichment. And you can't... But why did you... What's the reason why you think they should have gotten money? Because Corbus was unjustly enriched by selling their pictures without their permission. So doesn't that reduce itself to your claim that they had... that it's part and parcel of their right to publicity, correct? Because the only basis for their assertion of a right that they should have been paid for that is their right to publicity and their right in their name and likeness. Well, no, the right to their exploitation of their persona, and that's... Right, but if we conclude that the pictures could be sold because they're copyrighted and licensed for distribution and not a selling of their persona... Well, the point is that... Doesn't those two claims reduce to the same claim? No, what you're saying is if what you do is you decide that the Copyright Act preempts rights of publicity, which would change... No, I don't think that. I mean, I don't think that the Copyright Act does preempt rights of publicity and likeness. I don't, but I do think that the Copyright Act protects the distribution of photographs by a copyright owner. He can distribute them, all right? He can display them, but Corbis doesn't display them. They sell them. They sell the pictures. They can say they license a copyright. They're like a licensed distributor of any copyrighted work. Well, they buy volumes of pictures from archives, and they sell them without my client's knowledge or consent, and they make money off of that, all right? And what's been said here today is that once you put that persona into a fixed picture and sell the picture, you're selling a copyrightable item. Let me ask you something. If I go out in the public and I'm sitting on a sidewalk cafe and someone takes a picture of me and then decides it's a nice picture of people relaxing and enjoying themselves on a sidewalk cafe in Old Town, Pasadena, and sells it as a postcard, do I have any right? Is your name on that? I don't think so. They don't just sell the picture of your honor. What they do is they put a name search up on the Internet, and if I want a picture to exploit, to put on a product of Shirley Jones, I press a button, and all the pictures of Shirley Jones with her name near it come up. And then if I want to put it in a magazine, I pay one fee. If I want to put it on a product, I pay another fee. So that nobody gets, they get their cut. The photographer may get the cut if there's a photographer alive, but they may have bought books and things from other sources to sell these pictures. Don't let anybody fool you. They're not licensing a copyright. They're selling pictures. They're selling pictures by people who have spent their lives developing their fame and fortune. If they have a fortune, many of them do not, as you know. They make money off their own pictures. They have their own websites. What Corpus does diminishes their ability to make money off their persona, that they've worked all of their lives, all of their lives to develop, and to say that it's the custom of the industry, and that Judge Wilson, Judge Wilson said, you know, it's obvious that she consented, that Shirley Jones consented, because it's the custom of the industry that when you walk down the red carpet, Corpus can take that picture, buy it from an individual photographer, buy it from a paparazzi. They'll buy it from everywhere. Put it up there and sell it to Coca-Cola or anybody else. And you, Shirley Jones, you've got to monitor that, because you know what, Shirley? We put this warning up there. We put this warning, saying, you know, be careful, Mr. Coca-Cola. We're selling you this. We're charging you more money for this than we would charge the New York Times. But you be careful, because if you're going to put it in a bottle, you better go to Shirley Jones and get that consent, because we don't have it. We tell everybody we don't have it, and it's up to you, Coca-Cola or Coca-Cola. You're going to be sued. Okay? Now, I urge this court to take a look at Napster again, and Grokster again, because this same kind of an issue, even though in a different type of exploitation of rights, the trigger for the exploitation of those rights was held responsible to monitor that. Who, as Judge Goldberg said, and the Illinois Appellate Court eventually affirmed, but Judge Goldberg said, you've got to be kidding. You're going to put these folks in the position where they've got to monitor what the uses are of the people that you're selling it to and the people that you're charging more money to, when you're the one who's making the buck? And you take a look at the websites that we've cited before, that Corpus has that up on its own website, Your Honor. You tell me that they're performing a public service. Please go to ER 603 and see what their website says. They're making money. Everybody's making money. The photographer makes money. Corpus makes money. But not the people, not the folks who spent their lifetime developing their persona to sell their own pictures, to sell their own products, and they go ahead and do this and compete with them. I don't think the law of publicity or rights of publicity, be it common law or statutory law, is what Congress intended. You take a look at our Supreme Court in the case of the zucchini versus the only case in which the U.S. Supreme Court has dealt with these rights of publicity, because this is such an important issue to the industry in this state and stars around the country. My goodness, Screen Actors Guild and AFTRA, which I'm told just recently merged, why would they file? Why would they oppose the so-called standards or custom in the industry? Let me put some witnesses on the witness stand. Let's decide whether the consent of walking down the red carpet is a question of fact that no reasonable person, as Judge Wilson said, no reasonable juror would be able to say that Shirley Jones, when she walked down that aisle, did not consent to have Corbis sell her picture to Coca-Cola and make money nobody else makes money. I don't know, maybe some juror, maybe some unreasonable juror would find that. But think about that. She's selling her own pictures. Well, I must end, I know you're going to make me end, I must end by quoting from the Supreme Court. In the only case that I'm aware of in which, and it's a 1997 case, it's in the papers. What is the case? Your Honor, it's Zucchini v. Scripps Howard Broadcasting, 433 U.S. 562, 1997. And in that case, Zucchini performed a live union cannibal act. And some television station taped his act and then played it on the news. And despite Section 301, which my able opponent has spent some time arguing here, our Seventh Circuit, not the Ninth, said Zucchini could sue successfully for violation of his rights of publicity. And he was going to perform the act. The television station's tape was not authorized by Zucchini. And if Zucchini had recorded his act, that is, created the act, and the television station then televised the tape without this authority, then Zucchini would prevail on a copyright claim. Now, it's undisputed in this record that Shirley Jones has no copyright claim to the picture that this man took of her. And any right to publicity claim only then would be preempted. So that, indeed, and I think, Your Honor, raise that issue. Well, Shirley Jones didn't take that picture. She had nothing to do with that picture. She has no copyright in that picture. All she's got in that picture is her persona, which is what Corbis sells. Because nobody is going to buy my picture off of, if I were taken a picture of by Corbis, because who cares? What have I done? But what about Shirley Jones? She makes a living off of it. And then the last thing the Supreme Court says in that same case, in affirming Zucchini, the Supreme Court says the rationale for protecting the right of publicity is the straightforward one of preventing unjust enrichment by the theft of goodwill. And that goes to so many of the issues in this case. Is that case in your brief? I'm sorry? Is that case in your brief the Zucchini case? Yeah, it is in the brief, yes. It is? Yeah, it's in one of the briefs. There are so many briefs in this case. But, yeah, I promise you it's in probably everybody's brief. So, in closing, the District Court wouldn't give us leave if we didn't even address today to file an amended complaint so that I wouldn't have to file a separate lawsuit for Shirley Jones, which I think we've argued in our papers and will stand on as an abuse of discretion. The District Court granted summary judgment on every one of these cases. I fear, even though the District Court indeed found the downing controlled and that these pictures with the names and the subjects on the Corbis website were not preempted. He had a hard time with the statute itself. And I do believe when he said that there was a statute standing around it, I mean, I honestly believe that that affected his subsequent rulings. But all we want, Judge, to your honors, is to have this court give us a chance, give us a chance to go back to the District Court. Please, we ask you to vacate these orders, vacate the judgment for a massive amount of attorneys' fees that were entered against these folks who did nothing but seek to enforce their rights of publicity that they have developed over the many, many years that they worked in this industry and let the jury decide these issues. Okay, counsel, you're over your time, so thank you very much. Okay, I think you have some portion of your five minutes left. Let me start with Zucchini. Zucchini was not a preemption case. Zucchini was a case that the California Supreme Court stated involved not merely making use of another's name but usurping his entire act. Zucchini stands for the proposition that the right of publicity and the First Amendment coexist, that the right of publicity can reach claims that abound with the First Amendment. It says nothing about preemption. We also agree that the right of publicity and copyright can coexist. The question is one of lines wrong. The Supreme Court says when you usurp an entire act, you avoid the First Amendment. Likewise, if you usurped an entire act, you might avoid preemption. But the question here is whether or not when you do nothing more than offer a license and a copyright, nothing more than display a copyright, you have crossed the line and allowed copyright to be defeated entirely. We've heard discussion about the persona and that this is a claim of rights in a persona. It's important to look at the Jules Jordan case, which followed laws, and it said this. Gasper, the plaintiff, makes the same contention in the instant case as laws, arguing that the defendants misappropriated his name and, quote, persona in addition to his dramatic performance. We reject this argument for the same reason we reject it in laws. And the reason was that the aspect of that persona which was being sued over was what was fixed in the video there. I understand, Your Honor, Judge Wardlaw very clearly believes that a persona is not the same that they claim in copyright. And we don't disagree. But the place that a persona is bounded, a claim in persona is bounded by copyright is when you tell someone who owns an image, you can't license it to anyone. You can't display it to anyone. That is where the line is drawn. The fact that this is a picture, an image, does not make this case any different from a video or a sound recording. It can't be that when someone asserts a persona in a still picture, they're not preempted. But if they assert a persona in a video, they are. For example, we have a still picture of Anna Maria Alberghetti with Jerry Lewis. Now, is this not a subject that would be preempted when all you do is try to license this fixation? And yet the entire movie, if it were projected, would be outside of preemption. Now, if they had used a movie of the surfer, would that have been outside of preemption? In the Downing case, they used images, photographs of the surfers. If they had used a movie of the surfer, would that have been outside of preemption? If Abercrombie had shown a film of the surfers, would that have been something that somehow would not have been the same sort of attack on their, or use of their persona? It's not that every claim of a persona, that every copyright in a photograph overrules every claim to a persona under the right of publicity. There are uses which are still violations of the right of publicity. Promotional uses absolutely are. But when the only use involved is one that the Copyright Act requires that the copyright holder have, the right to display, the right to offer licenses, to allow, to characterize a claim as a persona, when it is really nothing other than saying block any use of your copyright, treads across the line. And whether you get there through Section 301, or whether you get there, and Your Honor, reading Judge Wilson's decision, he didn't consider conflict preemption. And whether a persona is a claim within the subject matter of copyright or not, conflict preemption still has to be considered. And so even if one concluded that a persona is not a claim within the subject matter of copyright, we still have to look at whether the regime that's proposed here, one that blows up an industry that has worked perfectly well for years and years, in which people have been able to obtain rights, is something that would conflict with the Copyright Act and the purposes of Congress. And I want just to get for one second to the emotional appeal that Mr. Gold has made here. We have a solution looking for a problem. There is no record suggesting that there's massive abuse of anyone's images. There's also no claim of secondary liability here. No one has suggested that Corbis is secondarily liable if Coca-Cola uses an image and doesn't pay for it. There's no allegation of such complicity in this complaint. And so to try to be analogizing to instances like Broxford or Napster had nothing to do with these facts. These facts are one in which to not allow a copyright owner to display and to distribute the works, which is the underlying rationale. We're not going to let it happen at all for any picture of any person. It would be to directly conflict with the copyright statute. Thank you. All right. So, Robert, I thank you very much. Thank you for the good arguments and the cooperation in consolidating this for argument so that we can make some sense of it. Thank you very much. Jones v. Corbis and Albregetti v. Corbis will be submitted, and we'll take up Kinney-Lee v. Cate.
judges: Fletcher, Wardlaw, Bybee